1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

                          ----oo0oo----

11

12  THE UNITED STATES OF AMERICA,
                                    NO. 2:02-cr-0468 MCE
13          Plaintiff,

14      v.                          MEMORANDUM AND ORDER

15  MONTE D. McFALL,

16          Defendant.

17                        ----oo0oo----

18

19      On March 8, 2005, following a jury trial, Defendant Monte

20  McFall ("McFall") was convicted of seventeen counts involving

21  attempted extortion, conspiracy to commit extortion, honest

22  services mail fraud, and witness tampering.  McFall timely moved

23  for a new trial pursuant to Federal Rule of Criminal Procedure

24  33, citing ineffective assistance on the part of his trial

25  counsel, William Romaine, as well as prosecutorial misconduct on

26  the part of the United States attorneys prosecuting the case.  In

27  addition, McFall claims he was convicted of certain offenses

28  which cannot legally be sustained against him, and seeks a new

                                  1

1  trial on that basis as well.

2      By Order dated April 14, 2006, the Court summarily denied

3  McFall's Motion on the prosecutorial misconduct issue, but set an

4  evidentiary issue to resolve various factual disputes concerning

5  McFall's ineffective assistance of counsel claims.  That hearing

6  was conducted on July 19 and 20, 2006.  At the close of that

7  hearing, the Court denied McFall's Motion for New Trial in its

8  entirety.  The following written order is supplemental to the

9  Court's ruling from the bench at that time.

10

11                          **BACKGROUND**

12

13      The grand jury initially charged McFall with honest services

14  mail fraud, attempted extortion and witness tampering on October

15  17, 2002.  On September 9, 2004, following two additional

16  superseding indictments, the fourth superseding charging document

17  was returned.  That indictment included a total of 20 charges

18  against McFall and became the operative indictment for purposes

19  of McFall's eventual trial.

20      McFall consistently demanded his right to a speedy trial

21  until just before trial commenced.  Even after the complexity of

22  the proceedings changed substantially with the indictment of four

23  additional co-defendants, T. Baxter Dunn, N. Allen Sawyer, J.

24  Tyler Reves and Lynn G. Bedford, McFall refused to exclude time

25  with respect to the timing of his trial.  McFall unsuccessfully

26  appealed this Court's August 3, 2004 denial of his motion to

27  dismiss the indictment for violation of the Speedy Trial Act.

28      William Romaine ("Romaine") substituted into this case as

                                2

McFall's counsel on April 6, 2004, after McFall discharged both
the federal defender's office and another private attorney,
William Portonova.  Just after Romaine's substitution, on April
13, 2004, the case was set to commence trial on October 13, 2004.
When the Court granted co-defendant Sawyer's request for
continuance (over McFall's objection) on August 26, 2004, less
than two months before trial was set to begin, it reset the
matter for January 26, 2005 and indicated in an unequivocal
matter that trial would commence at that time.

McFall's four other co-defendants entered guilty pleas
between January 11 and 18, 2005.  On January 18, 2005, Romaine
unsuccessfully moved to continue the trial as against McFall,
indicating he was not ready to proceed given those plea bargain
agreements.  Romaine nonetheless filed a witness list, trial
brief, and proposed jury instructions three days later, on
January 21, 2005.  Although Romaine reiterated his continuance
request on January 26, 2005, the first day of trial, that request
was also denied as being among other things, untimely.  As
indicated above, McFall ultimately was convicted of seventeen of
the twenty counts charged against him and subsequently filed the
present motion.

**STANDARD**

Federal Rule of Criminal Procedure 33(a) authorizes a
court, upon defendant's motion, to "vacate any judgment and grant
a new trial if the interest of justice so requires."  In
considering a motion for new trial, the court "need not view the

evidence in the light most favorable to the verdict; it may

weight the evidence and in so doing evaluate for itself the

credibility of the witnesses." United States v. Kellington, 217

F.3d 1084, 1095 (9th Cir. 2000).

The grounds pursuant to which a new trial may be granted

include claims based on ineffective assistance of counsel.

United States v. Cronic, 466 U.S. 648, 667 n. 42 (1984).

**ANALYSIS**

**A.   Ineffective Assistance of Counsel**

In moving for a new trial on grounds that the legal

representation he received fell below constitutional standards

mandated by the Sixth Amendment, McFall seeks relief under both

United States v. Cronic, supra, as well as the Supreme Court's

concurrently decided opinion in Strickland v. Washington, 466

U.S. 664 (1984).  Under Strickland, a defendant must demonstrate

that specific errors made by trial counsel affected the

defendant's ability to obtain a fair trial.  Cronic, on the other

hand, stands for the proposition that under certain narrow

circumstances prejudice resulting from ineffective assistance of

counsel ("IAC") can be presumed, thus making it necessary to

proceed to Strickland's requirement that prejudice be

demonstrated.  See Mitchell v. Mason, 325 F.3d 732, 741-42 (6th

Cir. 2003); cert. denied, 543 U.S. 1080 (2005).

In arguing that Cronic's presumption of prejudice analysis

should apply, McFall claims that two of the four circumstances

4

identified by Cronic as justifying relief are present.  First,
McFall claims that Romaine "entirely fail[ed] to subject the
prosecution's case to meaningful adversarial testing..." Cronic,
466 U.S. at 659.  Secondly, McFall asserts that under the
circumstances there was no "likelihood that any lawyer, even a
fully competent one, could provide effective assistance." Id. at
659-660.  (See Def.'s Mot. for New Trial, 8:26-27).

Alternatively, if the Court declines to find IAC under
Cronic, McFall asserts that Romaine's performance is nonetheless
deficient under Strickland because his representation "fell below
an objective standard of reasonableness." Wiggins v. Smith, 539
U.S. 510, 521 (2003).  As indicated above, Strickland also
requires a showing of prejudice, which is predicated on a
"reasonable probability that but for counsel's unprofessional
errors, the result of the proceeding would have been different."
Id. at 534, quoting Strickland, 466 U.S. at 692-94.  This two-
pronged test need not be addressed in any particular order.  If
an effectiveness claim is untenable on the prejudice prong, for
example, the court need not even consider the performance
requirement. Strickland, 466 U.S. at 697.  In addition, a
defendant relying on Strickland must show that the representation
provided falls outside the wide range of professionally competent
assistance (Id. at 718), and must further "overcome the
presumption that... the challenged action might be considered
sound trial strategy." Turner v. Calderon, 281 F.3d 851 (9th
Cir. 2002).

Because the Court's initial review of the papers submitted
in conjunction with McFall's Motion for New Trial raised

significant, disputed factual issues, most prominently with

respect to the Romaine Declaration attached as an exhibit to

McFall's moving papers, the Court scheduled an evidentiary

hearing, which as set forth above was conducted on July 19 and

20, 2006.

Having observed Mr. Romaine's performance throughout the

course of the lengthy underlying trial, and after considering

both his oral testimony at the evidentiary hearing and the papers

submitted by the parties hereto, the Court categorically rejects

any claim, under Cronic, that Romaine entirely failed to subject

the government's case against McFall to rigorous adversarial

scrutiny.  Romaine's grasp of the case against his client enabled

him to effectively examine, and cross-examine, the numerous

witnesses who testified at trial.  He made cogent arguments,

brought appropriate motions, and interposed timely evidentiary

objections that belie any claim that he effectively "slept

through" the proceedings against his client, as application of a

Cronic standard would appear to require.  Instead, the Cronic

presumption is "reserved for situations in which counsel has

entirely failed to function as the client's advocate."  Florida

v. Nixon, 535 U.S. 175, 125 S.Ct. 551, 561 (2004).  Under no

circumstances was that situation present here, and no presumption

of ineffectiveness under Cronic will be applied.

While McFall also attempts to invoke Cronic on grounds that

no counsel could have provided effective representation under the

circumstances of this case, that argument is even more far-

fetched.  McFall cites the complexity of the case, its voluminous

discovery, Romaine's alleged unfamiliarity with the discovery and

his determination to rely on the efforts of co-defense counsel as
pointing to the inescapable conclusion that no competent counsel
could have provided effective representation.  See Def.'s Mot.
for New Trial, 9:10-15.  Those contentions ignore the fact that
McFall had actively been pushing this case to trial throughout
its pendency, and that Mr. Romaine had been on notice for five
months that trial would proceed as scheduled on January 26, 2005.
McFall's argument also cannot be squared with the potential, well
known to any criminal defense attorney, that a charged defendant
can decide to accept a plea agreement at any time prior to trial.

Hence McFall's Motion for New Trial must necessarily hinge
on whether Mr. Romaine's alleged errors qualify as IAC under the
standards set forth in Strickland v. Washington.  McFall cites
numerous instances of Romaine's alleged incompetence, including
A) his failure to conduct pre-trial investigation; B) his failure
to secure a continuance of the trial, both because of inadequate
preparation and to ensure that trial would not occur until after
McFall's co-defendants were sentenced so that their testimony
could be scured; C) his alleged failure to address in limine
issues in a competent manner; D) the fact that he allegedly
opened the door for the introduction of devastating character
evidence against McFall; E) his failure to exclude the
government's evidence of the purported causal link between
McFall's alleged threats to Calpine representatives and the San
Joaquin County Board of Supervisors' passage of a negative
resolution concerning the East Altamont Energy Center project; F)
his failure to secure admission at trial of Allen Sawyer's grand
jury testimony; G) his presentation of defense witnesses from

7

1   which testimony detrimental to McFall was elicited; and H) his

2   failure to properly analyze McFall's potential extortion

3   liability under the Hobbs Act.

4       Turning first to Mr. Romaine's alleged failure to

5   investigate, and his claimed resulting failure to properly

6   prepare for trial, Romaine testified at the evidentiary hearing

7   that he believed counsel for all four co-defendants had agreed to

8   jointly hire an investigator as a matter of legitimate resource

9   distribution, since he felt the interests of all four on this

10  matter coalesced.  Romaine further testified that given the

11  witness tampering charges levied against his client, he

12  considered a joint investigation approach to be preferable.

13  These decisions represent a strategic determination on Romaine's

14  part that pass muster under <u>Strickland</u> standards.

15      Romaine's actions once he realized that no joint

16  investigation would be forthcoming are similarly not outside the

17  parameters of objective reasonableness.  He organized trial

18  materials in binders, read much of the voluminous discovery

19  materials generated by the case, and worked extensively with his

20  client, who he described as one of the most knowledgeable and

21  sophisticated criminal defendants he had ever encountered, with a

22  singular command of the issues presented.  Moreover, given the

23  month that elapsed between the start of trial and commencement of

24  the defense case, Romaine testified that he continued to review

25  pertinent documentation and reviewed applicable discovery as

26  witnesses were about to be called.  This preparation was

27  reflected in Romaine's handling of witnesses, both on direct and

28  cross-examination, and his mastery of the material at hand.

8

Romaine's performance in that regard simply does not evince an overwhelming lack of preparation as McFall would now lead the Court to believe.

In addition, with respect to the prejudice prong of the Strickland analysis, Romaine was not able to identify specific evidence that he would have uncovered had he prepared more extensively and/or conducted more investigation.  He could provide nothing beyond mere speculation as to how the case would have unfolded differently, and was unable to point to a single document in hindsight that would have made a difference in the trial's ultimate outcome.  At most, Romaine opined that his presentation of the case might have been "sharper" had he had more time to prepare.  This, however, does qualify as constitutionally defective assistance of counsel.  Significantly, while McFall's current counsel claims that investigation should have revealed the existence of several witnesses exculpatory to Mr. McFall, including Crystal Quinly, Gloria Nomura, and Robert Sarvey, the anticipated testimony of those witnesses would not likely have made any material difference in the trial's outcome, as Strickland requires.  Instead, as noted by this Court on the record at the close of the evidentiary hearing in this matter, the evidence of McFall's guilt was otherwise overwhelming.

Mr. Romaine's attempts to secure a trial continuance also survive scrutiny under Strickland.  While McFall contends that Romaine did not adequately inform the Court as to the "depths of his unpreparedness", as indicated above Romaine's actual trial performance is inconsistent with that contention.  Moreover, McFall's contention that Romaine should have secured a

continuance so that his co-defendants could testify is flatly
disingenuous.  In a unitary trial, Romaine could not have forced
co-defendants to testify.  In addition, once they pled guilty to
reduced charges, said co-defendants could still invoke their
Fifth Amendment right to avoid self-incrimination.  Postponing
the trial until after sentencing of the co-defendants had
occurred would not alter that right, and in any event only the
Court, and not McFall or his counsel, controlled when sentencing
would occur.  It is accordingly presumptious for McFall and his
attorneys to contend that Romaine should have been able to affect
the timing of that sentencing.

Finally, any request for continuance must necessarily be
viewed in the context of what had been, for some five months, a
firm date for the commencement of trial.  McFall had repeatedly
asserted his speedy trial rights and given those circumstances no
adequate showing for a continuance could have been asserted by
Romaine, or anyone representing McFall for that matter.

In continuing to press his claims of IAC on Mr. Romaine's
part, as indicated above McFall also claims that Romaine's
handling of pre-trial *in limine* matters was inadequate.  McFall
first contends that Romaine should have more vigorously opposed
the government's request to introduce certain evidence pertaining
to McFall's alleged prior bad acts under Federal Rule of Evidence
404(b).  The incident with which McFall takes issue concerns his
alleged theft of a shotgun using the authority of co-defendant
Dunn and his law enforcement connections.  Given the fact that
the central issue in this case revolves around McFall's alleged
misuse of influence/authority, any argument posited by Romaine as

to the inadmissibility of the incident would have been unavailing. Equally misplaced is McFall's contention that pre-trial rulings should have been secured by Romaine as to the inadmissibility of other bad character evidence ultimately introduced by the government. That evidence was not properly subject to an *in limine* request prior to trial since its introduction was wholly dependent on whether McFall himself tendered the issue of his character in defending the charges levied against him. Consequently the admissibility of such evidence necessarily had to be determined during the course of the trial itself rather than prior to its commencement.

In fact, McFall's character did become a central issue in the trial given the testimony of numerous prosecution witnesses concerning his intimidating and manipulative behavior in exerting influence. As Mr. Romaine pointed out at the evidentiary hearing, that left him little choice other than to present McFall's own testimony in an attempt to rebut those implications through the strength of McFall's own personality and alleged credibility. Romaine testified that he felt particularly constrained in that regard given the unavailability of testimony from McFall's co-defendants as to what transpired during certain key events. Romaine further testified that the implications of calling McFall as a witness were carefully considered. Significantly, once McFall did testify concerning his good behavior, the incidents of prior bad behavior identified by the government became both relevant and admissible. Romaine testified that he was aware of much of the bad character evidence prior to trial, so given the consideration he accorded to the

11

1   utility of McFall's testimony he must necessarily have taken the
2   risk of that evidence being admitted into account.  Romaine made
3   a strategic decision that McFall's testimony was necessary
4   despite that risk.  The fact that he did not anticipate much of
5   the bad character evidence being actually introduced does not
6   detract from his strategic choice, and does not itself constitute
7   IAC.  Moreover, since McFall's character was already the pivotal
8   issue in the case, the fact that Romaine elicited character
9   testimony from other witnesses was of no moment, and would not
10  have fundamentally changed the evidence admissible against
11  McFall.

12      McFall's next IAC claim concerns evidence tying his
13  influence to the San Joaquin County Board of Supervisor's
14  negative resolution concerning Calpine's proposed East Altamont
15  Energy Center project.  That claim is also unpersuasive given the
16  considerable evidence linking McFall to the negative resolution,
17  as well as the fact that Romaine interposed appropriate
18  objections to the testimony offered in that regard but was
19  unsuccessful in doing so.  McFall has not shown that any
20  reasonable attorney could have prevented admission of that
21  evidence.  Nor has McFall established that Robert Sarvey's
22  proposed testimony (which the Court rejected), to the effect that
23  organized opposition to the project had already coalesced,
24  altered the fundamental issue of McFall's own involvement in
25  seeking to quelch the project.

26      Both parties devote substantial briefing as to whether or
27  not Romaine was ineffective in failing to introduce Allen
28  Sawyer's grand jury testimony into evidence at McFall's trial.

12

Romaine tried strenuously to have that testimony admitted on
grounds that the government's motive at the time the testimony
was obtained was "similar" to the government's motive with
respect to said testimony at the time of trial, and that
accordingly the testimony was admissible pursuant to Federal Rule
of Evidence 804(b)(1).  The government's response, which McFall
did not controvert at the time of the evidentiary hearing, was
that Sawyer's grand jury testimony was elicited for fact-finding
purposes.  Sawyer was not a target at the time of the testimony,
had not been issued a target letter, and was initially included
within the government's witness list.  Romaine did not take these
representations at face value and still tried to argue that
Sawyer was nonetheless considered a suspect.  The Court rejected
that argument and refused to admit the testimony.  There was
nothing more that Romaine could have done to secure a different
result and his efforts in that regard cannot be considered
ineffective.  In addition, given the fact that Sawyer was
indicted for having offered perjured testimony before the grand
jury, the Court properly found that his unrebutted testimony
would have a substantial danger of prejudicing and misleading the
jury pursuant to Federal Rule of Evidence 403.

The next portion of McFall's multi-pronged IAC challenge
concerns certain testimony adverse to McFall elicited from
McFall's own defense witnesses.  McFall himself concedes in his
Motion for New Trial, however, that "the mere fact that a witness
damages the case of the person calling the witness does not mean
the decision to call the witness was professionally
unreasonable."  Def.'s Mot. for New Trial, 58:13-15.  As Romaine

agreed at the time of the evidentiary hearing, surprises
invariably occur in the context of a trial as large and
complicated as this one.  Romaine explained in his declaration
that given the time constraints he faced in preparing for the
case alone after McFall's co-defendants accepted plea agreements,
he was unable to interview certain witnesses and had to rely on
McFall's own judgment and input as to just which witnesses should
be introduced.  Romaine Decl., ¶ 13, Exh. "B" to Mot. for New
Trial.  Particularly given Romaine's assessment of McFall as one
of the most sophisticated and knowledgeable defendants he had
ever encountered, his reliance on McFall's judgment cannot be
deemed professionally unreasonable, particularly since Romaine
testified that he always made his own independent judgments as to
trial management despite his client's input.  Romaine's actions
must be viewed from his perspective at the time and may have been
based quite properly on information provided by McFall.  See
Strickland, 466 U.S. at 691.

McFall's last argument with respect to IAC pertains to
Romaine's alleged failure to properly research the scope of
McFall's liability for extortion under the Hobbs Act.  That
argument merges with McFall's additional claims that he was
convicted of certain offenses which, as a matter of law, cannot
stand, and will be discussed and rejected below.

As a final matter, with respect to Romaine's alleged
ineffectiveness as a whole, present counsel for McFall place much
emphasis on Romaine's own declaration, in which he opines that,
at least at the trial commenced, he "felt wholly unprepared to
proceed with a competent and effective defense to the charges

14

1    against Mr. McFall." Romaine Decl., ¶ 5.  Two closing comments

2    in response to that assertion are in order.  First, as indicated

3    above, Romaine clearly testified that he continued to prepare as

4    the trial progressed, and his examination of witnesses reflects

5    that preparation.  Secondly, Mr. Romaine's testimony at the

6    evidentiary hearing made it clear that he gauged his readiness

7    for trial based on his own personal standards of preparation.  He

8    specifically did not offer any opinion as to whether those

9    standards fell below constitutionally mandated requirements for

10   effective counsel, and the Court finds no constitutional

11   violation in that regard occurred in the context of McFall's

12   representation at trial.

13

14   **B.   Convictions for Legally Defective Claims**

15

16        1.  Calpine/Sunlaw Charges (Counts 2, 3. 5).   McFall's

17   present counsel argue that McFall cannot be liable for the

18   attempted extortion of Calpine because disrupting Calpine's right

19   to bid on construction of a power plant cannot constitute the

20   "obtaining" of property under the Hobbs Act, as set forth by the

21   Supreme Court in Scheidler v. NOW, Inc., 537 U.S. 393 (2003).

22   Scheidler examined the issue of whether anti-abortion protestors

23   who used violence and threats of violence to disrupt abortion

24   clinic operations could commit extortion under the meaning of the

25   Hobbs Act, which defines "obtaining" as constituting both a

26   deprivation and an acquisition of property.  Id. at 404.  While

27   the protestors obviously did not seek any tangible property

28   through their activities, the government argued that the effect

1  of seeking to control clinic access nonetheless amounted to an

2  intangible "obtaining" of property.  The Supreme Court found this

3  to be an inadequate basis for imposing Hobbs Act liability since

4  the defendants "neither pursued nor received 'something of value

5  from' [the plaintiffs] that they could exercise, transfer, or

6  sell."  Id. at 405.

7       The majority opinion was nonetheless careful in declining to

8  trace the "outer boundaries" of extortion liability under the

9  Hobbs Act, explaining that "liability might be based on obtaining

10 something as intangible as another's right to exercise exclusive

11 control over the use of a party's business assets."  Id. at 402.

12 Scheidler then proceeds to cite with approval its previous

13 decision in United States v. Green, 350 U.S. 415 (1956) and

14 Carpenter v. United States, 484 U.S. 19 (1987).  Green notes that

15 "extortion... in no way depends upon having a direct benefit

16 conferred on the party who obtains the property" (Green, 350 U.S.

17 at 420), and Carpenter held that where a reporter traded

18 securities based on confidential information owned by the Wall

19 Street Journal, the notion that no "money or property" was

20 "obtained" from the Journal was untenable.  Even more

21 significantly, the Scheidler majority, by way of footnote, makes

22 the following pronouncement in response to the dissent's position

23 that its decision outlined Hobbs Act liability too narrowly:

24          "[T]he dissent is mistaken to suggest that our decision
            reaches, much less rejects, lower court decisions such as
25          United States v. Tropiano, 418 F.2d 1069, 1076 (1969), in
            which the Second Circuit concluded that the intangible right
26          to solicit refuse collection accounts "constituted property
            within the Hobbs Act definition."
27

28 Scheidler, 537 U.S. at 402 n. 6.

                                  16

1    In <u>Tropiano</u>, the defendants were convicted of Hobbs Act

2  extortion and conspiracy for using threats of violence to

3  dissuade a competitor from taking business away from the

4  defendant's refuse collection business.  The defense claimed that

5  such right to do business was not property obtained by the

6  defendants in contravention of the Hobbs Act.  The <u>Tropiano</u> Court

7  rejected that contention, explaining that property within the

8  meaning of the Hobbs Act "is not limited to physical or tangible

9  property or things, but includes, in a broad sense, any valuable

10  right considered as a source or element of wealth and does not

11  depend upon a direct benefit being conferred on the person who

12  obtains the property."  <u>Tropiano</u>, 418 F.2d at 1075.  Therefore,

13  the competitor's right to solicit accounts were found to

14  constitute property under the Hobbs Act.  <u>Id.</u> at 1076.

15    Here, as in <u>Tropiano</u>, McFall's attempt to preclude Calpine

16  from bidding on the Port of Stockton power plant facility amounts

17  to an "obtaining" of property under the Hobbs Act, particularly

18  since McFall and certain of his co-defendants stood to gain a

19  $1,000,000 fee for helping Calpine's competitor, Sunlaw, obtain

20  the power plant site.  This improper attempt to secure a business

21  advantage falls within the purview of Hobbs Act liability.

22    Significantly, in a Northern District case decided

23  subsequent to <u>Scheidler</u>, <u>Dooley v. Crab Boat Owners Ass'n,</u> 271 F.

24  Supp. 2d 1207 (N.D. Cal. 2001) the court found that defendants'

25  conduct, in causing plaintiffs to cease their crab harvesting

26  operations during a strike, deprived plaintiffs of their property

27  even though that property was not actually transferred to the

28  defendants.  The Court found that if an individual gains control

17

over the use of a competitor's business asset, that person has obtained the property of another for Hobbs Act purposes even if the asset is as intangible as the right to solicit business.  <u>Id.</u> at 1213.

<u>Dooley</u>, like <u>Tropiano</u>, points squarely to the propriety of McFall's Hobbs Act convictions on the Calpine/Sunlaw counts. Because those convictions were sustainable as a matter of law under the circumstances of this case, McFall's related argument that the jury instructions on Counts 2, 3 and 4 were fatally flawed is misplaced as well.  McFall's challenge to the jury instructions is premised on the same argument already rejected above.  Because McFall did not object to the jury instructions in question at trial, the adequacy of said objections is reviewed for plain error at this juncture.  <u>United States v. Elias</u>, 269 F.3d 1003, 1017 (9th Cir. 2001).  "Plain error is 'error that is so clear-cut, so obvious, a competent district judge should be able to avoid it without benefit of objection.'" <u>United States v. Klinger</u>, 128 F.3d 705, 710 (9th Cir. 1997).

There was no such plain error with respect to the jury instructions on the Calpine/Sunlaw counts.  Moreover, with respect to McFall's argument that Romaine's representation was remiss in failing to appreciate the subtleties of <u>Scheidler</u>, the Court as stated above rejects McFall's interpretation and accordingly finds that no ineffective assistance of counsel occurred in that regard.

2.  <u>Golden State Developers Charge (Count 11)</u>.  In Count 11, McFall was charged with attempted extortion under color of

official right given his representations to David Corliss, senior
vice president of Golden State Developers, that he "could be a
big political influence" on San Joaquin County Supervisor Lynn
Bedford's opinion on a project requiring Board of Supervisors
approval.  McFall proposed a payment of $50,000 to $100,000,
explaining that if he was "happy" with the project, then Bedford
would be "happy" with the project.  See RT 793-795.  Under Jury
Instruction No. 35, the jury was instructed that McFall could be
convicted of attempted extortion under color of official right if
he attempted to obtain property in return for the taking or
withholding of some official action by Lynn Bedford.  McFall was
ultimately convicted on Count 11, and now argues that, as a
private citizen, he could not be found guilty of extortion under
color of official right despite the influence he touted over
Supervisor Bedford's ultimate decision.

In United States v. Freeman, 6 F.3d 586 (9th Cir. 1993), a
legislative aide agreed, in exchange for payments from an
undercover agent, to move a special interest bill through the
California legislature with the help of his employer, an
assemblywoman.  The aide claimed that he and the assemblywoman
were "inseparable" and that he spoke for her.  Id. at 591.  While
the aide was undisputedly a governmental employee, the Freeman
court applies Hobbs Act liability to "anyone acting under color
of official right," irrespective of "whether such powers were
conferred by election, appointment, or some other method."  Id.
at 593, emphasis added.  McFall asserts that the holding of
Freeman must be narrowly restricted to government employees
rather than more expansively applied to someone who simply

purports to control the decision making of an elected official.

In the Court's view, the rationale of Freeman may properly be extended to an individual, like McFall, who parades his control or influence over a public official in alleged concert with such official.  Case law supports that extension.  In United States v. McClain, 934 F.2d 822, 830 (7th Cir. 1991), for example, the Seventh Circuit held that while a private person may not ordinarily act "under color of official right" for purposes of Hobbs Act extortion, exceptions exist if such a person acts in coordination with a public official.  As the court states:

> Of course, our analysis does not apply... to a private citizen actually masquerading as a public officials... nor does it grant private persons immunity from "official right" suits when they act in coordination with public officers."

Id.

Both Jury Instruction No. 35 and McFall's conviction under Count 11 were proper.


3.  Diamond Generating Charge (Count 13).  Count 13 charged McFall with attempted extortion given his threat to utilize his political influence to thwart Diamond Generating's plan to build a power plant in San Joaquin County.  McFall asserts that his conviction on that charge is legally inadequate, because his conduct amounted no "nothing more than threatening to participate in the state and local political arenas." (Mot. for New Trial, 71:10-11).  According to McFall, the government cannot show that his conduct in that regard was "wrongful", as required by the Hobbs Act for extortion liability.  See United States v. Dischner, 974 F.2d 1502, 1515 (9th Cir. 1992).  A "wrongful" act

20

is one done "unfairly and unjustly by one having no lawful claim".  Id.  Conduct is "wrongful" is "a wrongful means [is used] to achieve a wrongful objective."  United States v. Pendergraft, 297 F.3d 1198, 1205 (11th Cir. 2002).

Try as he might, McFall cannot paint his involvement in the Diamond Generating matter as legitimate legal and political opposition falling outside the ambit of the Hobbs Act.  While he relies on United States v. Albertson, 971 F. Supp. 837 (D. Del. 1997) to support his position in that regard, in Albertson there was no question that the plaintiff had legitimate reasons for initially opposing local development, even if he did ultimately agree to drop that legitimate opposition in exchange for a donation to the plaintiff's semi-professional football team. Here, on the other hand, McFall's actions were motivated from the very start entirely by considerations of his own financial gain. On October 16, 2001, the day after he obtained an option to purchase the so-called Pishos property near Lathrop, he threatened to use his influence to stop the proposed Diamond Generating power plant if the site of the plant was not moved to the Pishos property, and if McFall did not receive a fee as a result of Diamond's purchase of that property.  See RT 2430-34, 2441-42.  McFall's threatened opposition therefore had nothing to do with legitimate concerns as to the merits of the Diamond Generating project but instead was designed entirely to benefit his private personal advantage.  That conduct constituted impermissible extortion rather that legitimate opposition, and McFall's challenge to Count 13 is unfounded.

1

2

3

4

5                                    **CONCLUSION**

6

7        For all the foregoing reasons, McFall's Motion for New Trial

8   is denied in its entirety.

9        IT IS SO ORDERED.

10  DATED: August 8, 2006

11

12

13                                    _____

14                                    MORRISON C. ENGLAND, JR

                                      UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28